**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-3393-14T3
      A-4789-14T3

STATE OF NEW JERSEY,

  Plaintiff-Respondent,

v.

JOEY J. FOWLER, a/k/a JOEY
WILLIAMS, SHAQUAN WILLIAMS,
SHAQUAN HARRIS, and JOEY
FLOWER; and JAMIL L. HEARNS,
a/k/a KHALIL HEARNS, JAY L. LOVE,
JAYSON LOVE, JAMES HOLMES,
and JAMEEL HEARNS,

  Defendants-Appellants.

_____

Argued (A-3393-14) and Submitted (A-4789-14)
November 29, 2017 – Decided March 8, 2018.
Remanded by Supreme Court July 30, 2019.
Resubmitted March 12, 2020 – Decided July 13, 2020

Before Judges Alvarez and Suter.

On appeal from the Superior Court of New Jersey, Law
Division, Union County, Indictment No. 11-08-0827.

Joseph E. Krakora, Public Defender, attorney for appellant Joey J. Fowler (Marcia H. Blum, Assistant Deputy Public Defender, of counsel and on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant Jamil Hearns (Michael James Confusione, Designated Counsel, on the brief).

Lyndsay V. Ruotolo, Acting Union County Prosecutor, attorney for respondent (Milton Samuel Leibowitz, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the briefs).

Appellants filed pro se supplemental briefs.

PER CURIAM

The New Jersey Supreme Court remanded the matter for this court to address defendants Joey J. Fowler's and Jamil Hearns's remaining issues on appeal. Our prior reversal and remand to the Law Division for a new trial was itself reversed by the Court's decision. State v. Fowler, 239 N.J. 171 (2019). Both defendants raised numerous additional points of error, none of which have merit. Therefore, we affirm the convictions and sentences.

Although we consolidate the matters for decision, with two exceptions, the points are addressed separately. Those exceptions are the arguments regarding the testimony of Algere Jones, a witness at the trial, and sentencing.

I.

Only Hearns testified. At the time of the shooting, Hearns owed Jones $5000. Hearns said that on that night, he offered Jones partial repayment, which Jones rejected. The men were standing outside of a bar with Donnell Johnson, the victim, who was Jones's cousin. According to Hearns, Johnson tried to convince Jones to accept the partial payment. Hearns alleged Jones pulled a gun out of his waistband and pointed it at Hearns; he then struggled with Jones over control of the gun, and the gun went off with two bullets striking Johnson. He and Fowler fled. Johnson died two days later from his wounds.

The State's witnesses testified to the contrary. There was bad blood between Fowler and Johnson, arising from Johnson's alleged prior assault and carjacking of Fowler. Fowler had reported the attack to the police.

Jones testified to the contrary, stating that on the evening of March 4, 2011, he, the victim, and some others went to a nightclub. An hour or two later, Jones left to visit a friend. He returned to the area and waited for Johnson to leave the club. As Johnson walked towards Jones's car, Jones pulled alongside, and as the two men spoke through the open passenger window, Jones noticed a shadow approaching. The person was wearing a dark-colored hoodie, but Jones

A-3393-14T3

was able to see the person's face. He recognized Hearns, whom he had known since childhood.

Jones heard gunshots, Johnson ran down the street, and Jones followed him. Johnson eventually got in the car and Jones drove him to the hospital where he died two days later from his bullet wounds.

Off-duty officers heard the sounds of shooting, as did uniformed officers posted nearby. Detective James Malone, Jr., drove to the area and saw a man, later identified as Hearns, running down the street while wearing a black hooded sweat jacket and holding something in his right hand. Hearns got into a small silver Infiniti. Fowler had been standing by the driver's side door, and once Hearns got into the car, he immediately pulled away from the curb. Malone drove past and cut off the car, forcing it to stop. As Malone approached the front of the car, he saw Hearns reaching towards the back with his right hand. Malone then ran towards the passenger side and saw Hearns place a gun on the center tray between the two rear passengers. Malone yelled for the occupants to put their hands up in the air, which they did with the exception of Hearns, who kept trying to exit the car while Malone held and kicked the door shut. Other officers who immediately arrived seized the occupants of the vehicle as well as the gun.

The Union County Chief Medical Examiner testified the cause of death was a gunshot wound to Johnson's back and left thigh. The State's expert in firearms forensic identification opined that the handgun taken from the vehicle was operable, and bullets fired from it matched those taken from Johnson's body. The State also presented surveillance video depicting the victim outside the bar near Fowler.

Jones initially denied knowing anything about the shooting, even denying taking Johnson to the hospital. When he finally came forward, he did so as part of a plea agreement, hoping it would save him time in prison on his federal matter.

While Jones was testifying, he said he and defendant met when they "had been - we were incar–[.]" The judge immediately interrupted. Defense counsel made a motion for a mistrial, then immediately withdrew it. The court declined to grant a mistrial sua sponte, and instructed the jury to totally disregard Jones's volunteered statement.

Through its witnesses, the State proffered that there was bad blood between Johnson and Fowler arising from the carjacking. Fowler's sister was called by the State, but denied having previously told police that defendant had said to her that he did not know what he would do if he saw Johnson before the

A-3393-14T3

police arrested him. To rebut her denial, the prosecution proffered a video of Fowler's sister making that statement.

After Hearns testified, the State on rebuttal presented Tywan Cobb. He said he had spoken to Hearns over a couple of months, during which time, Hearns admitted he was carrying a weapon that night intending to shoot someone, and intended to claim that there had been a "tussle" over money, even though none had occurred. Cobb also acknowledged that he had charges pending, and that he testified regarding Hearns's statement as part of his plea agreement with the State.

The trial judge did not allow Fowler's attorney to cross-examine Jones about statements allegedly made by Johnson to Jones that although he and Fowler had previously had a conflict, that they had seen each other that evening and "patched things up." Counsel argued it was admissible hearsay under N.J.R.E. 803(c)(3).

The jury convicted Fowler and Hearns of first-degree murder, N.J.S.A. 2C:11-3(a)(1) (count one); second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b) (count two); and second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count three). Additionally, Hearns was charged in count four of the indictment with hindering, N.J.S.A.

2C:29-3(b)(4). Both defendants were sentenced on the same date, December 19, 2014. Fowler, charged as an accomplice, was sentenced to fifty years imprisonment subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. Hearns was sentenced to forty-five years subject to NERA. The State agrees with the defendants that their conviction for possession of a weapon for an unlawful purpose should be merged with the murder count.

II.

On appeal, Fowler raises the following points in the counseled brief:

> POINT I
> THE COURT ERRED IN REFUSING TO INSTRUCT ON SELF-DEFENSE AND ACCIDENT DESPITE ITS ACKNOWLEDGMENT THAT THE CODEFENDANT TESTIFIED THAT THE VICTIM WAS SHOT BY ACCIDENT IN THE COURSE OF THE CODEFENDANT'S ATTEMPT TO DEFEND HIMSELF.
>
> POINT II
> THE COURT ERRED IN REFUSING TO ALLOW DEFENDANT TO CROSS-EXAMINE ALGERE JONES IN ORDER TO REBUT THE STATE'S MOTIVE EVIDENCE.
>
> POINT III
> THE COURT ERRED IN FAILING TO GIVE A COOPERATING-WITNESS INSTRUCTION WITH RESPECT TO ALGERE JONES.

POINT IV
THE COURT ERRED IN DENYING THE MOTION FOR A NEW TRIAL AFTER THE JURY HEARD TESTIMONY THAT DEFENDANT HAD PREVIOUSLY BEEN INCARCERATED.

POINT V
THE CONVICTION FOR POSSESSION OF A GUN FOR AN UNLAWFUL PURPOSE SHOULD HAVE MERGED WITH THE MURDER.

POINT VI
THE 50-YEAR TERM IMPOSED ON DEFENDANT, WHO WAS CHARGED AS AN ACCOMPLICE, IS FIVE YEARS GREATER THAN THE SENTENCE IMPOSED ON THE CODEFENDANT, WHO WAS THE PRINCIPAL, AND IS EXCESSIVE.

In his uncounseled brief, Fowler states the following:

POINT I:
THE TRIAL COURT PREJUDICED THE DEFENDANT BY REFUSING TO INSTRUCT ON SELF DEFENSE TO THE JURY. BY SUCH ERROR, THE DEFENDANT WAS DEPRIVED OF HIS RIGHT OF A FAIR TRIAL, BECAUSE THE RECORD REVEALS SEVERAL TESTIMONIES AT TRIAL ONLY ATTRIBUTED TO CO-DEFENDANT'S LIABILITY OF ACTS IN SELF DEFENSE REQUIRING REVERSAL OF THE CONVICTION.

POINT II:
APPELLANT MOVES FOR A REMAND TO THE TRIAL COURT, TESTIMONY ABOUT DEFENDANT'S PRIOR INCARCERATION PREJUDICED HIS RIGHT TO A FAIR TRIAL.

A-3393-14T3

POINT III:
APPELLANT MOVES FOR A REMAND TO THE TRIAL COURT, THE TESTIMONY OF TYWAN COBB UNFAIRLY PREJUDICED THE DEFENDANT.

POINT IV:
APPELLANT MOVES FOR A REMAND, THE TESTIMONY OF ALGERE JONES WAS RES GESTAE EVIDENCE IN NATURE, AND SHOULD HAVE BEEN ALLOWED UNDER N.J.R.E. 803(c)(3), TO DEFEAT THE STATE'S THEORY ON MOTIVE, WITH THE FACTS, THEREFORE DEFENDANT AT LOWER COURT WAS DEPRIVED OF A FAIR TRIAL.

POINT V:
APPELLANT MOVES FOR A REMAND TO THE TRIAL COURT TO CONDUCT A GROSS HEARING SINCE THE CREDIBILITY OF A WITNESS CLEARLY AND CONVINCINGLY CONSTITUTES A DENIAL OF JUSTICE, MOTIVATED REQUIRES [sic] CONVICTION BE OVERTURNED AND VACATED DUE TO AN UNFAIR TRIAL WHICH VIOLATES DEFENDANT'S RIGHTS GUARANTEED BY THE U.S. CONST. AMENDS V & XIV, § 1; N.J. CONST. ART. I, PAR. 1.

Hearns raises the following points:

Point 1
The trial court erred in denying defendant's request to charge self-defense, and in failing to sua sponte charge aggravated and reckless manslaughter as lesser included offenses to murder; the trial court erred in denying defendant's motion for a new trial on this ground.

9

Point 2
The trial court erred in denying defendant's motion to dismiss the indictment because of violation of his speedy trial right.

Point 3
The trial court erred in not granting severance during trial, sua sponte, or in not granting defendant Hearns a new trial on this ground.

Point 4
Reference to the co-defendant Fowler's prior incarceration caused an unfair trial for both defendants during the joint trial below.

Point 5
Defendant's right to remain silent was violated.

Point 6
The prosecutor placed improper hearsay before the jury that violated defendant's state and federal right to confront the witnesses against him.

Point 7
An unfair trial was caused by the trial judge telling the jury that a State witness was incarcerated and being brought over from prison to testify.

Point 8
Defendant's sentence is improper and excessive.

In his uncounseled brief, Hearns adds the following:

Point I
The Incentivized Witnesses/Informants Used In The Case At Bar Illegally Contributed To Appellant['] s Fundamental Wrongful Conviction Where The Prior Inconsistent Statements Exposed The Credibility Of

A-3393-14T3

These Individuals Nor Was There Substantive Evidence.

Point II
The Prosecutor's Failure To Inform The Defense Of The Exact Inducement Rewards Amounted To Withholding Of Exculpatory Evidence.

Point III
The Informants/Witnesses Was Unreliable As Jail House State Agents And Federal Agents Whom The Prosecutor Knew Would Hinder Appellant's Confrontation And Cross Examination Clause Rights Contrary To Appellant's U.S. Const. 14Th [sic] Amend. And 6th Amend. Rights, and N.J. Const. Art. I Para. 10 Rights Being Guarded As Protected.

### III.

We review issues not raised at trial under a plain error standard. R. 2:10-2. This means we reverse where the error was "clearly capable of producing an unjust result." R. 2:10-2.

Absent a clear abuse of discretion, we uphold evidentiary decisions of the trial court. State v. Gorthy, 226 N.J. 516, 539 (2016). We disturb those rulings only when so wide of the mark as to result in a manifest denial of justice. Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016) (quoting Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)).

11

## A. JONES'S TESTIMONY

Hearns contends that unfair prejudice was caused by the jury hearing Jones testify while wearing jail clothes, and by the judge's reference to the fact that Jones was being brought over from the jail. In this case, contrary to the more commonplace situation, Jones was being called, not as a defense witness, but as a State's witness. If anything, his jail garb and the judge's passing comment undermined his credibility, to defendants' benefit. We consider the point to lack such merit as to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Fowler contends that the court erred in refusing to allow counsel to cross-examine Jones in order to refute the State's motive evidence. N.J.R.E. 803(c)(3) frames exceptions to the hearsay rule for a declarant's statement about his state of mind. But:

> [a] deceased victim's then-existing state of mind cannot directly prove a defendant's motive; the state-of-mind exception to the hearsay rule does not permit imputation of a defendant's state of mind out of no more than a deceased person's feelings about that defendant. That is to say, subject to certain exceptions, a fact probative of the victim's state of mind, standing alone, does not tend to prove any material fact about a defendant's conduct or state of mind.
>
> [State v. Calleia, 206 N.J. 274, 291-92 (2011).]

The state of mind exception should be construed narrowly, and the focus is whether the declarant's state of mind is directly relevant to the issues at trial. State v. McLaughlin, 205 N.J. 185, 189 (2011).

In this case, the victim's state of mind was not relevant to any issue. Counsel argued in support of admission that decedent's state of mind was relevant in order to explain Johnson's presence at the nightclub where the killing occurred. However, the judge ruled that the state of mind was not pertinent because motive was at issue, not presence. Thus, the judge sustained the State's objection.

Even if offered to depict the victim's state of mind—the argument now raised—the alleged statement was not relevant on the issue of whether or not the killing, as observed by an eyewitness, occurred. Furthermore, even if the victim thought the conflict had ended, that did not mean that the shooting did not occur and that Fowler had reconciled with Johnson. The statement was being proffered to establish defendant's state of mind without him testifying.

Fowler's brief also argues that the judge did not give the jury a cooperating witness instruction. The record does not support the claim, however.

The judge gave an instruction, which closely followed the model jury charge, to the effect that the jury should "give[] the testimony of such witness

13                                                          A-3393-14T3

careful scrutiny." See Model Jury Charge (Criminal), "Testimony of a Cooperating Co-Defendant or Witness" (rev. Feb. 6, 2006). The argument does not require further discussion. R. 2:11-3(e)(2).

With regard to Jones's fleeting comment on direct examination, Jones said he met Fowler when "we were incar[.]" The judge stopped him from completing the sentence. The judge immediately gave a limiting instruction, directing the jury that not only should they disregard what they heard, but that "it is stipulated between the parties in this case that the witness and . . . Fowler knew each other from the neighborhood." Given the brevity of the comment, and the judge's prompt curative instruction, no prejudice occurred. No further discussion is necessary. R. 2:11-3(e)(2).

## B. FOWLER

In his uncounseled brief, Fowler contends that Cobb's testimony prejudiced him because the witness used the plural tense, implying that more than one person was involved in the shooting. Cobb was called as a rebuttal witness, and testified only as to the statements made to him by Hearns.

The court charged the jury, however, that when deliberating the statement should be used only as to Hearns. A jury is presumed to follow a judge's

instructions.  State v. Burns, 192 N.J. 312, 335 (2007).  The point does not warrant further discussion.  R. 2:11-3(e)(2).

Fowler also contends that a Gross hearing should have been conducted before a video of his sister's recorded statement to the police was played for the jury.  She said in a recorded interview with police that Fowler told her he did not know what he would do if the perpetrators of the carjacking were not found but unequivocally denied making the statement while testifying during the trial.  However, a Gross hearing is required only when a prior inconsistent statement is sought to be admitted for its substantive value.  See State v. Gross, 121 N.J. 1, 8-9 (1990).  In this case, as the trial judge correctly stated, the purpose of the video was to impeach the sister's credibility as a witness, not for its substantive value.  Therefore, the judge did not err in denying defendant's motion.  The judge instructed the jury before they viewed the video that they could only consider it for credibility purposes, not for its substance.  No further discussion is warranted.  R. 2:11-3(e)(2).

## C.  HEARNS

Hearns contends his right to a speedy trial was not honored.  A defendant has a fundamental right to a speedy trial guaranteed both under the United States Constitution and the New Jersey Constitution.  Whether the right to speedy trial

has been violated is guided by four factors: "the length of the delay, the reasons for the delay, whether the defendant asserted his right to speedy trial, and any prejudice to the defendant occasioned by the delay." State v. Farrell, 320 N.J. Super. 425, 449-450 (App. Div. 1999). As to the length of delay, we consider whether the delay beyond New Jersey's sixty-day goal was excessive. See State v. Tsetsekas, 411 N.J. Super. 1, 11 (App. Div. 2009). Delays that are reasonably explained will be considered less consequential than those without reasonable justification. See Farrell, 320 N.J. Super. at 449-50. Courts also examine the timing of a defendant's assertion of his speedy trial rights. See State v. Fulford, 349 N.J. Super. 183, 193 (App. Div. 2002). Finally, prejudice to the defendant can include a host of considerations, including, for example, loss of employment. Tsetsekas, 411 N.J. Super. at 13.

Defendant was arrested March 5, 2011. The trial court denied defendant's June 11, 2013 speedy trial motion, finding that a two-year delay in a multi-defendant murder trial was not unusual. When the trial date was set at June 3, 2013, the court was unable to proceed. The next available date was September 20, 2013, but the court again had to reschedule the matter. The trial did not begin until May 12, 2014. Conference dates were adjourned at the request of defense counsel on at least three separate occasions, once at the request of the

State. Significant delays were caused by pretrial motions necessary for the fair disposition of the matter. Thus, the delay was not caused by the State. Although prejudice is presumed when there is a delay, defendant did not specifically identify any resulting prejudice. Thus, the delay did not warrant dismissal of the complaint because it was reasonable and no specific prejudice resulted from it.

A determination by a trial judge on a defendant's application for dismissal of an indictment due to speedy trial considerations is not overturned unless clearly erroneous. See State v. Marino, 153 N.J. Super. 12, 17 (App. Div. 1977). It was not clearly erroneous in this case, or even erroneous at all.

Next, Hearns contends that the court erred in not sua sponte severing the trials, and not granting Hearns's motion for a new trial on that basis. A trial judge's decision denying a motion for a new trial is not reversed unless it clearly appears that there was a miscarriage of justice under the law. R. 2:10-2. In deciding whether such a miscarriage occurred, we defer to the trial court with respect to those "intangible aspects" only the trial court can know such as credibility, demeanor, and "feel of the case." Carrino v. Novotny, 78 N.J. 355, 360 n.2 (1979). Otherwise, we make an independent determination as to whether a miscarriage of justice occurred. Ibid. "The decision on whether to

17                                                                    A-3393-14T3

grant a severance generally 'rests within the trial court's sound discretion and is entitled to great deference on appeal.'"  State v. Lado, 275 N.J. Super. 140, 149 (App. Div. 1994) (quoting State v. Brown, 118 N.J. 595, 603 (1990)).

Under Rule 3:7-7, "[t]wo or more defendants may be charged in the same indictment . . . if they are alleged to have participated in the same act . . . constituting an offense or offenses."  There is a "preference to try co-defendants jointly."  State v. Robinson, 253 N.J. Super. 346, 364 (App. Div. 1992).  Where "much of the same evidence is needed to prosecute each defendant, a joint trial is preferable."  State v. Sanchez, 143 N.J. 273, 281 (1996) (quoting State v. Brown, 118 N.J. 595, 605 (1990)).  Joint trials foster an efficient judicial system, spare witnesses and victims the inconvenience and trauma of testifying about the same events more than once, serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts, and allow for a more accurate assessment of relative culpability, which sometimes operates to a defendant's benefit.  See id. at 282.

However, the interest in judicial economy is not unchecked as Rule 3:15-2 provides an avenue for separate trials where defendants may be prejudiced by being tried jointly:

> If for any other reason it appears that a defendant or the
> State is prejudiced by a permissible or mandatory

joinder of offenses or of defendants in an indictment or accusation the court may order an election or separate trials of counts, grant a severance of defendants, or direct other appropriate relief.

[R. 3:15-2(b).]

In determining whether severance is appropriate,

the trial court must focus on the substance and quality of the proffered testimony, and attempt to ascertain the testimony's exculpatory value. The court should distinguish between credible, substantially exculpatory testimony and testimony that is insignificant, subject to damaging impeachment, or unduly vague, conclusory, or cumulative. Where the testimony rendered unavailable by a joint trial is not substantially exculpatory, a defendant has not suffered cognizable prejudice for the purpose of Rule 3:15-2(b). Where, however, the proffered testimony is likely to be significantly exculpatory, denying the defendant's severance motion could be highly prejudicial to the defendant, and potentially could lead to the conviction of an innocent person.

[Sanchez, at 291].

There was no error committed here by the trial judge in failing to sua sponte order separate trials. Hearns did not demonstrate specific prejudice arising from the joint trial. Although Hearns argued that he was not able to demonstrate his lack of motive to harm the victim in general terms, he did not and does not advance a single instance where as a matter of strategy or for some

other reason he could have taken a different approach during the course of a separate trial.

Hearns fully cross-examined the State's witnesses, even with regard to the incident that led to Fowler's complaint to police about the carjacking. That testimony highlighted that Hearns was uninvolved in the incident. Given that Hearns cannot identify how he was prejudiced, other than making a general argument based on speculation, he has not demonstrated that a miscarriage of justice occurred. No new trial should have been granted on that basis. There was no miscarriage of justice. The argument lacks merit.

Issues not raised at trial, as we have said, are reviewed under a plain error standard. R. 2:10-2. Such decisions are reversed only if the error was clearly capable of producing an unjust result.

Now on appeal, Hearns argues that his Fifth Amendment right to remain silent was violated when the prosecutor asked a detective, after playing the video of Hearns's interview, "does defendant Hearns invoke his Fifth Amendment right at that point?" The officer answered "yes," and the prosecutor goes on to ask, "and you are no longer talking to him?" and he answered "correct." Defense counsel did not object. No reference was made to the testimony thereafter.

Obviously, the tape could have been ended without explanation. But, that defense counsel did not object at the time demonstrates that the comment was perceived as fleeting and innocuous. See State v. Timmendequas, 161 N.J. 515, 576 (1999). Had defendant objected, obviously, the court could have provided a curative instruction, advising the jury to disregard it. This unobjected-to testimony, in light of the other evidence presented, could not have alone prejudiced defendant's right to a fair trial. State v. Cain, 224 N.J. 410, 432 (2016). Furthermore, even if error, it was harmless in light of the other proofs presented, which included eyewitness testimony.

Next, defendant contends that the court erred by allowing the medical examiner to testify based on another doctor's autopsy report and accompanying photographs. This argument is also reviewed employing plain error analysis, as no objection was made at the time.

An expert need not personally examine the subject matter before providing an opinion. See State v. D.R.H., 127 N.J. 249, 264 (1992). Additionally, the New Jersey Supreme Court has recently determined that a substitute medical examiner can testify as an expert regarding the results of an autopsy. State v. Bass, 224 N.J. 285, 291-92 (2016).

The testifying expert witness here reached an independent opinion within a reasonable degree of medical certainty regarding the cause of death. He explained his findings, providing information about the wounds caused by the bullet, as well as his basis for the conclusion. His analysis was based on the work of another, yet his ultimate opinion was founded on his independent examination of the evidence.

Thus, as established in Bass:

> [T]he State may present the testimony of a qualified expert who has conducted independent observation and analysis regarding an autopsy conducted by a medical examiner who is unavailable to testify at trial, without violating the defendant's confrontation rights under the Sixth Amendment of the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution.
>
> [Ibid.]

Hearns's right to confrontation was not violated.

In his uncounseled brief, Hearns contends that both Cobb's and Jones's testimony should have been excluded because the testimony was "incentivized." Defense counsel was not informed "of the exact inducement rewards" which meant exculpatory evidence was withheld, and that the inherent unreliability of the testimony because these were informants meant their testimony should have been excluded. The arguments have no support in the law. Overall, we consider

22

them to be so lacking in merit as to not warrant discussion in a written opinion. R. 2:11-3(e)(2).

### D. SENTENCING AS TO BOTH DEFENDANTS

We review criminal sentences with an eye towards whether there is a clear showing that an abuse of discretion has occurred. State v. Bolvito, 217 N.J. 221, 228 (2014). We affirm the sentence of a trial court unless "(1) the sentencing guidelines were violated; (2) the findings of aggravating and mitigating factors were not 'based upon competent credible evidence in the record;' or (3) 'the application of the guidelines to the facts' of the case 'shock[s] the judicial conscience.'" Ibid. (alteration in original).

Furthermore, a sentencing court is required to weigh aggravating and mitigating factors as set forth in the statute. See N.J.S.A. 2C:44-1(a) and (b). Trial judges must explain how they arrive at a particular sentence employing that analysis. State v. Case, 220 N.J. 49, 65 (2014). This trial judge qualitatively assessed the statutory factors. See State v. Fuentes, 217 N.J. 57, 72 (2014).

As to Fowler, the judge found aggravating factor three, defendant's risk of reoffense; six, the seriousness and extent of his prior criminal record; and nine, the need to deter him and others. N.J.S.A. 2C:44-1(a)(3), (6), and (9). The judge found no mitigating factors. He anchored his conclusions on Fowler's

A-3393-14T3

extensive prior criminal history, including an aggravated arson, aggravated assault, disarming a law enforcement officer, contempt, certain persons not to possess a handgun, drug charges, and a history of violations of parole. Additionally, he said, "This was basically the ordering of an execution over a beef over a car." The trial judge carefully analyzed the statutory factors, assessing the weight of each in a manner supported by the record. Given Fowler's prior criminal history and the nature of this offense, his sentence to fifty years subject to NERA does not shock our conscience. Nor given his role in the homicide, does it appear unfairly disproportionate when compared with Hearns's forty-five-year sentence.

In similar fashion, the judge carefully reviewed Hearns's prior criminal history. He found in that case aggravating factor three, defendant's risk of re-offense; aggravating factor six, the seriousness of his prior criminal history; and aggravating factor nine, the need to deter him and others, and no mitigating factors. N.J.S.A. 2C:44-1(a)(3), (6), and (9). Hearns was the shooter. The judge supported his findings based on his prior criminal history of three counts of robbery, weapons offenses, a burglary, drug distribution, and resisting arrest. Although Hearns had family, and requested that mitigating factor eleven be found, there was nothing about the circumstances that made his situation any

A-3393-14T3

different from that of any other defendant who has children. All suffer a tragic loss because of the imprisonment of a loved one. The judge carefully and thoughtfully analyzed the relevant factors as to this defendant as well. Our conscience is not shocked by the sentence.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3393-14T3